FILED
U.S. DISTRICT COURT
EASTERN DISTRICT OF TEXAS

JUL 2 0 2005

DAVID J. MALAND, CLERK
BY
DEPUTY _____

```
 1                IN THE UNITED STATES DISTRICT COURT
                  FOR THE EASTERN DISTRICT OF TEXAS
 2                       MARSHALL DIVISION

 3    CONNECTEL                  )
                                 )  DOCKET NO. 2:04cv396
 4        -vs-                   )
                                 )  Tyler, Texas
 5                               )  10:30 a.m.
      CISCO SYSTEMS, INC.        )  May 18, 2005
 6
                      TRANSCRIPT OF MOTION HEARING
 7              BEFORE THE HONORABLE LEONARD DAVIS
                    UNITED STATES DISTRICT JUDGE
 8
                      A P P E A R A N C E S
 9
      FOR THE PLAINTIFF:        MR. DANIEL PEREZ
10                              MR. MARK CALHOUN
                                MR. GARRETH SAROSI
11                              MS. JULIE ROBERTSON
                                WINSTEAD, SECHREST & MINICK
12                              5400 Renaissance Tower
                                1201 Elm Street
13                              Dallas, Texas  75270

14                              MR. BRAD SEIDEL
                                POTTER MINTON
15                              500 Plaza Tower - 110 N. College
                                Tyler, Texas  75702
16
      FOR THE DEFENDANT:        MR. SAM BAXTER
17                              McKOOL SMITH
                                P.O. Box O
18                              Marshall, Texas  75671

19                              MR. ERIC LAMISON
                                MR. ADAM ALPER
20                              KIRKLAND & ELLIS
                                555 California St.
21                              San Francisco, CA  94104

22    COURT REPORTER:          MS. SHEA SLOAN
                                211 West Ferguson
23                              Tyler, Texas  75702
                                903/590-1176
24
      Proceedings taken by Machine Stenotype; transcript was
25    produced by a Computer.
```



1              P R O C E E D I N G S

2              THE COURT:  Please be seated.

3              All right.  Ms. Ferguson, if you will call the case,

4    please.

5              THE CLERK:  Court calls case No. 2:04cv396,

6    ConnecTel v. Cisco Systems, Inc.

7              THE COURT:  Announcements, plaintiffs?

8              MR. PEREZ:  Dan Perez representing ConnecTel from

9    Winstead Sechrest and with me is Julie Robertson, Mark

10   Calhoun, and Garreth Sarosi.  And also with me is Local

11   Counsel Brad Seidel.

12             THE COURT:  Good morning.

13             On behalf of defendants?

14             MR. BAXTER:  Your Honor, Sam Baxter, McKool Smith.

15   With me is Eric Lamison and Adam Alper.  We are ready.

16             THE COURT:  All right.  Very good.  All right.

17   Y'all can't get along on your preliminary infringement

18   contentions; is that correct?

19             MR. BAXTER:  That's correct, Your Honor.

20             THE COURT:  What seems to be the problem?

21             MR. BAXTER:  Mr. Lamison is going to explain it,

22   with the Court's permission.

23             THE COURT:  How long do you think your presentation

24   is going to take, Mr. Lamison?

25             MR. LAMISON:  Probably about 20 minutes.

1    MR. PEREZ: Your Honor, I can get in and out in less

2    than ten.

3    THE COURT: Okay. Very good.

4    MR. LAMISON: Your Honor, on behalf of Cisco we have

5    moved to compel ConnecTel to provide a supplemental chart

6    complying with your Patent Rule 3-1(c), which requires the

7    plaintiff to prepare with its preliminary infringement

8    contentions a chart identifying specifically where each

9    element of each asserted claim is found within each accused

10   instrumentality. That is the rule under which we have

11   presented our motion.

12        And by way of an overview, there are four issues

13   that have been presented with the preliminary infringement

14   contentions that have been provided by the plaintiffs. By way

15   of background in this case, ConnecTel asserts 120 claims from

16   four patents against more than 100 products seeking, according

17   to their Amended Complaint nine billion dollars in damages

18   from Cisco. This is a complex case where they have asserted

19   the patent claims against the vast majority of products that

20   Cisco makes. It is a very big case in terms of the number of

21   products that are at issue.

22        In order for us to defend the case and to orderly

23   progress the case toward orderly claim construction, it is

24   necessary for us to understand why each of these more than 100

25   products are alleged to infringe each of 120 claims. It is

1   important for us to have that information so that we can

2   prepare claim constructions for Your Honor that are limited to

3   those terms that are actually in dispute so that we don't

4   present <u>Markman</u> briefing on more claims than are necessary or

5   miss claim terms that may be needed to be addressed.  And

6   without an understanding of where the infringement is, it is

7   impossible for us to efficiently do that.

8          So what I would like to describe are the four issues

9   with their contentions, and then I have some specific examples

10  on slides to illustrate this.

11         First of all, they don't address each accused

12  product but instead they have addressed four categories.

13  Those four categories that they have created are routers,

14  switches, gateways, and a category called the IOS operating

15  system.  They use each of their four categories as a surrogate

16  for all of the products within that alleged category.  So we

17  do not have a chart that provides a contention with respect to

18  any single specific Cisco product that is accused in this

19  case.  Not one.  It is a summary chart.

20         The second issue, which we will show in more detail,

21  is that this confusion is compounded by the fact that most of

22  their charts simply mimic the claim language.  The left-hand

23  column, as we will show Your Honor, has the claim language.

24  The right-hand column has the claim language with the word

25  "Cisco" for the vast majority of the elements.  We do not have

1  a circumstance where they have walked us through from

2  beginning to end one claim with respect to even one product.

3         The third issue is that what they have done instead

4  is they have provided footnotes, 600 footnotes where they say

5  that is where you can find the identification of the accused

6  element.  Out of those 600 footnotes, 590 simply say "see

7  supra." Ten footnotes, approximately, have text.  But that

8  text is not a description of the infringement.  It is

9  references to page numbers and Cisco data sheets.

10         Of course, when we go to the Cisco data sheets we

11  are not able to determine which passage or which quote or

12  which portion relates to the claim elements and, therefore, it

13  is basically left as -- essentially it is a treasure hunt, but

14  there is no treasure.

15         By way of background, as I mentioned, what is the

16  harm?  We want to move this case forward orderly and

17  efficiently because this Court is well-respected for moving

18  patent cases to trial; under this Court's rules, very prompt

19  trials.  I practice in San Francisco and we have similar

20  rules, but our courts don't move these cases as quickly to

21  trial.  Cases tend to take three years to get to trial.  That

22  is not the way things work here.  This Court is well-respected

23  for promptly moving cases to trial and using those same rules

24  but in a different way.

25         This Court uses the rules to make sure the parties

1   move their cases to trial.  If we don't know what our 100

2   products that they are seeking nine billion dollars in damages

3   are allegedly doing to infringe, how do we identify claim

4   terms under this Court's docket schedule where we are supposed

5   to provide claim constructions on June 16th?  We have had to

6   identify more than 75 claim terms for potential construction,

7   not because we want to construe 75 terms.  We don't.  We

8   certainly don't want to brief them, and we certainly don't

9   want to burden this Court with terms that may not be

10  necessary.

11        But if we don't know how they are applying the

12  claims, we are stuck because we are going to lose the date.

13  We might not put the term on the table.  Then we find out how

14  they are applying the claims.  Then we say this is the term to

15  construe.  We will have missed our opportunity.  We are forced

16  to do all of this work because we don't know why we supposedly

17  infringed.  That is the only reason we are here.

18        We have no interest in filing motions

19  unnecessarily.  We are not asking for any sanction.  We are

20  not asking for any money.  We haven't engaged in name-calling.

21  We have simply said we want to know why, why when I call the

22  client and say these guys are asking for nine billion dollars.

23  Why?  I don't know.  I have looked through their charts, and I

24  don't know what the infringement is.  My colleagues don't

25  know.  People we have consulted with don't know.  That is why

1   we are here.

2              In addition to that on noninfringement you can

3   imagine the number of people we may need to meet with to

4   discuss these over 100 products that represent the vast

5   majority of a multi-billion dollar company to understand,

6   well, if this is their contention do we or why don't we do

7   this, et cetera; but without knowing the contention, we are

8   basically hampered in our ability to do that.

9              And on invalidity, boy, we would like to know how

10  they are asserting these claims because these products have

11  been around for a long time.  Cisco was founded in 1984.  More

12  than a decade before Mr. Kaplan, the inventor in this case,

13  first came up with his technology.  And Cisco basically came

14  up with the technology that enables Internet work.

15             A group of Stanford University scientists came up

16  with innovative routing methods.  We are innovators in this

17  field, and these products that they are accusing have existed

18  long before Mr. Kaplan's patents.  We want to know how they

19  are finding infringement.  That is important to understand how

20  these products that have preexisted these patents by more than

21  a decade could infringe but have these patents be valid.

22             Until they tell us -- and I submit they may be

23  concerned about taking a position because they may be

24  concerned that it is going to lead to a validity question so

25  they are avoiding it.  They are avoiding it I think

1    deliberately so they can move the case forward, pick an

2    infringement theory that they think is going to enable them to

3    maintain validity.  And so we are not able to prepare the

4    appropriate defenses, in our view.

5           I would like to now show the Court an example of

6    their claim charts that mimic the claim language.  We have

7    chosen as an example Independent Claim 1 of the '404 Patent,

8    which is one of the four patents in suit.  Following the claim

9    preamble, which is the large box at the top, we have the

10   elements of the claim.  And under the patent law, as this

11   Court is I am sure familiar, there has to be satisfaction of

12   every element of the claim to be infringing.

13          And under this Court's patent rules they have to

14   tell us where each element, each element is found in each.  So

15   if we go to the steps that I have highlighted in blue and in

16   the column it says the claim requires receiving the data.  The

17   claim also requires examining the received data.  With respect

18   to Cisco, they say Cisco routers receive data and examiners

19   receive data.  That is not particularly helpful.  That is what

20   the claim says.  They put the word "Cisco" in the right-hand

21   column and that is their identification of that element.  The

22   Court will also note there is no footnote on this element

23   because we will get to the issue of whether these footnotes

24   satisfy the rules, which we don't think they do.  But in here

25   there is no footnote.

1      So this element, we are entitled to know where each

2  element -- that is this Court's rules -- each element of each

3  patent is found in each accused product.

4      Go to the next one.

5      There is a step of identifying the examined data

6  which matches said one of the one or more first variable

7  parameters.  They say, "The Cisco routers identify the

8  examined data which matches one or more of the first variable

9  parameters."  It is just a direct quote of the claim language

10  with the words "Cisco" and "routers"; and, again, I don't see

11  a footnote on this one.  And also it doesn't tell us why they

12  are doing it.

13      We can move forward.  Step G, "analyzing said

14  measured second variable parameter and said predetermined

15  parameters."  What do they say for Cisco?  "The Cisco routers

16  analyze the measured second variable parameter and the

17  predetermined parameters."  Again, this is simply a direct

18  quote of the claim language with the word "Cisco."  It is not

19  informing us of these issues.

20      And then if I move forward.  This claim is a

21  method -- this is of importance -- they are all important, but

22  this is a particularly important step in a claim because this

23  sort of ties all these elements together, this particular

24  step, the determining step.  And they simply quote the claim

25  language.  Determining which of said patents, et cetera, and

1    the lower box which is the language from their chart, they

2    just say the Cisco routers do it.  That is it.

3             There is a footnote on this one.  It is an

4    interesting story about this footnote because when they served

5    their original contentions on March 17th, there was no

6    footnote at all.  So we had a meet and confer about it, and we

7    said, folks, we need to know why we infringe.  They said what

8    is wrong with our charts?  You copied the claim language.  We

9    have footnotes.  I said, well, I will get to your footnotes

10   because I don't think they work.  But let's go to one of these

11   key critical steps in the claim, the determining step.  There

12   was no footnote.

13            So they served a supplement, and they put a

14   footnote.  And the footnote said "see supra" and it goes to

15   some other footnote that had text.  So it was just a cosmetic

16   change.  So this is an example of the independent claim and

17   the way that they approached it.  Now, there are some

18   elements -- this is another example.  This is the final

19   element.  Again, it is just a verbatim quote transferring the

20   data to the remote destination.  "The Cisco routers transfer

21   the identified data to the remote destination."  Again, it is

22   an exact quote of the claim language but inserting the word

23   "Cisco."

24            As you can see also this isn't an identification of

25   any product.  This category -- the one that I went through was

1   for the router category.  In other words, they didn't do

2   this -- the chart doesn't refer to any specific Cisco product

3   at any time, whether it is a router, a switch, or a gateway.

4   So we have the issue that they are not telling us the

5   products.  They are certainly not going to each element of

6   each product, and it is leaving us guessing.

7           There were some steps where they inserted little

8   tidbits of information.  But that information doesn't -- they

9   haven't done it for each element.  They haven't done it for

10  the key element of determining, the one that ties it

11  altogether.  Even when they give us these snippets and say,

12  well, this is, for example, the way they do this and they

13  don't really say how it is done with any detail.  So I don't

14  think these were sufficient either.  But they have never

15  once -- I think from a larger perspective of this claim, they

16  have never once walked us through this claim from beginning to

17  end and shown us where each element of this claim is found in

18  any product.  It has not been done.

19          And in a case where we have more than 100 products

20  accused of infringing 120 claims where they are seeking nine

21  billion dollars in damages I think it would be fair for them

22  to tell us why they think we infringe.

23          Similarly, we have these dependent claims.  These

24  are the ones that come down off independent claims, as Your

25  Honor I am sure is familiar with the distinction between

1    independent and dependent claims.   There are many, many

2    dependent claims in these patents.

3            With respect to the dependent claims, ConnecTel's

4    charts simply copy verbatim the language.   There is no snippet

5    in even the dependent claims.   It says this is the claim

6    language.   And they insert the word the Cisco routers

7    generally.   Again, no reference to a specific product.   And

8    nothing other than the quote of the claim language.

9            Interestingly, when they served the original charts

10   on March 17th there weren't any footnotes for any of the

11   dependent claims.   None.   So we asked them on the phone; and,

12   again, I will get to the footnotes because I don't think that

13   works for them.   But they said the footnotes are the solution.

14   There is not a single footnote against a single one of the

15   dependent claims.   How do you explain that?

16           They said we can fix that.   So we spent all day on

17   the phone meeting and conferring with them on the following

18   day trying to get these contentions.   The result of it is they

19   have sent us over a supplement and they have added a footnote

20   to each dependent claim; and as the Court can see, each one of

21   those footnotes says "see supra."   There is no new text, there

22   is no new information.   It is just referring us back to a

23   footnote.   It really was difficult to try to advance the ball

24   forward and get some further information.

25           And here is an example of what these look like.   590

1  of the 600 footnotes say "see supra." They don't have any

2  text at all, let alone a reference to a document or let alone

3  reference to a passage in a document. I would now like to

4  address those few footnotes out of the 600 footnotes that have

5  text. What that text is are string citations to multiple

6  Cisco data sheets that they provided in binders with their

7  charts. Those string citations which are not -- first of all,

8  they didn't footnote every element. Even in those instances

9  where they did footnote it we have gone to these and they have

10 provided references to pages of data sheets.

11         We are unable to find on those pages of data sheets

12 the alleged claim element. We are not able to find it because

13 these pages have lots of text on them and we are not able to

14 find on these pages where the element is because they haven't

15 told us. They haven't told us. They believe that -- their

16 hope is that because they provided four boxes -- or binders of

17 documents, that one would conclude they must have complied

18 with the rule because they have given us this very large

19 massive piece of information, so it must comply with this

20 Court's rules. But it doesn't.

21         We don't know -- we are entitled to a chart. The

22 language is rather specific. A chart that specifically

23 identifies where each element of each asserted claim is found

24 in each accused product. We just don't have that. And these

25 footnotes which are sporadically used, again, 590 of 600 just

1    say "see supra." Few of them have these references to pages.

2    We are not able to lift from these pages where the element is

3    found on that page.

4         We don't think the elements are there. That is one

5    of the issues, but certainly they should have to put them in

6    the chart so we can see them. This is an example of what a

7    page looks like. There is lots of text on the page. We go to

8    the page, but we don't know where the element is.

9         The other thing they did when they supplemented was

10   they said, okay, well, it sounds like you guys don't

11   understand your products. So to help you understand your own

12   products we are going to send you a nutshell tutorial about

13   Cisco IOS. They sent us a book saying -- we are going to help

14   you understand your products. The issue isn't that we need

15   help understanding our products. The issue isn't that our

16   Cisco folks that we interact with to follow this case don't

17   know how their products work. The issue is they haven't told

18   us where the infringement is in our products. That is why we

19   are here. And providing a third-party nutshell about our

20   product doesn't meet their obligation to tell us where it is.

21        In sum, the charts simply mimic the claim language.

22   They don't identify a single structure, process, algorithm,

23   feature, or function of any accused product. We did wish to

24   meet and confer. We certainly don't want to spend our time on

25   motion practice. We very much wish to resolve this issue

1    without the Court -- needing to seek the Court's

2    intervention.

3         After our first meet and confer the parties agreed

4    to have a second meet and confer where they would spend

5    essentially a full business day on the phone talking to one

6    another and walking through the claim and see if we could get

7    the information and then discuss an appropriate supplement.

8    Two lawyers in my office spent a full day on the telephone

9    with counsel for ConnecTel. We also had the resources of a

10   consultant available. And basically said let's walk through

11   one claim from beginning to end and show where the

12   infringement is in one product or a few products.

13        We tried to do that, but we were unable through that

14   call to determine how even one product infringed one claim.

15   In fact, ConnecTel counsel mentioned that they had further

16   facts they had learned in their prefiling investigation, but

17   they contended those facts were privileged from discovery and

18   that we were not entitled to know those facts.

19        After that meeting they served supplemental picks to

20   reflect the meeting; and as we have shown, those supplemental

21   preliminary infringement contentions did not provide any more

22   information. They just added multiple hundreds of footnotes

23   that said "see supra." They didn't do anything to provide

24   more information. They added footnotes to all of the

25   dependent claims that said "see supra." They didn't provide

1   any more information.  Yet we spent -- two lawyers a full day

2   on the phone.  And we couldn't get one -- the identification

3   of the infringement of one claim against a few products.

4          And Mr. Perez kindly sent me a letter offering to

5   continue to have such discussions.  He said in his letter --

6   you know, the parties were only able to discuss one claim with

7   respect to a few products.  We spent the whole day, two

8   lawyers on the telephone, one claim and a few products.  We

9   have 120 claims and more than 100 accused products.  If that

10  is what it takes to try to figure out their theory and we

11  didn't, we weren't able to get it, it confirms they need to

12  put it in the chart so that we can take it from the chart.

13         So that was the only reason that we said, you know,

14  these dates are clicking by.  At this point we have to focus

15  on getting a motion to Your Honor.  We also had to do our

16  invalidity contentions.  This was in early April when we had

17  this last discussion when he said at this point we need to

18  move toward.  One of the things they criticize in the briefs

19  is they say it took us three weeks to get our motion papers

20  together.  The reason it took us three weeks to do it was in

21  the middle our invalidity contentions were due.  We didn't

22  have a clue how they were applying the claims.

23         So when we did -- we had to think about it from

24  this very vast perspective of how are they applying the

25  claims.  It took us an enormous amount of time to put those

1    together, I submit far more time than it would have or should

2    have taken if they had told us up front under Your Honor's

3    rules why we infringe, how they are applying the claims. We

4    could have certainly spent less time putting that together

5    than having to guess how they are applying the claims. And so

6    we wanted to file the motion. We also wanted to comply with

7    the rules.

8           And we, therefore -- it did take us three weeks to

9    get this motion on file because we were busy trying to comply

10   with this Court's rules on the invalidity contentions which

11   were due at that time, right in the middle. They never did in

12   that offer say we offer to provide more information. In fact,

13   they never in their papers said we will supplement. They say,

14   well, we may need to supplement in the due course of

15   discovery. But they have never once said when they will do

16   it. They have never said we are going to supplement. And

17   they have certainly never said we are going to supplement

18   before Cisco has to provide all of its claim constructions in

19   this case.

20          To the contrary, what -- the way they are doing this

21   is they are going to supplement when it is convenient for them

22   without regard to what this Court's scheduling dates are. So

23   by the time we figure out why they say we are infringing, we

24   will have already had to provide our claim constructions. We

25   will already be in the Markman briefing, and that is not the

1    way that Your Honor's rules are designed.  That is the

2    antithesis of the orderly progress of this case that Your

3    Honor's rules dictate that enable this Court to have such a

4    tremendous reputation for moving cases towards trial very

5    promptly and very efficiently.

6            This issue about the facts, by the way, that they

7    say we are not entitled to the facts they have obtained in the

8    prefiling investigation, I believe that is inconsistent with

9    the longstanding rule that underlying facts are not

10   privileged.  We are not asking for their documents that they

11   created.  We want the facts put into the chart.  The

12   underlying facts aren't work product --

13           THE COURT:  Slow down just a little bit for the

14   Court Reporter.

15           MR. LAMISON:  Sorry.  The underlying facts are not

16   protected from disclosure.  That is a longstanding rule.  We

17   even cited some of Your Honor's decisions that acknowledge

18   that, and appellate court decisions.  It is a pretty universal

19   rule.  And similarly, while we didn't cite those cases, it

20   occurred to me while I was preparing for the argument last

21   night, that is similar to something people say when they are

22   asking for contention interrogatories.  And they say, well,

23   that is a contention interrogatory.  And they say, well, I am

24   going to object on work product.  And there are many cases

25   that say you can't object to a contention interrogatory on a

1   work product basis. In fact, it does require you to put your

2   mental impressions and theories into the chart.

3           The facts, and to a certain extent a contention

4   interrogatory, does -- it gets how are you applying the claim.

5   You have to disclose it. And these rules are meant to do away

6   with the need to have these interrogatories and to do it

7   through the rules. But it is the same concept. You are

8   supposed to get the contentions. And the underlying facts nor

9   are the contentions privileged. They shouldn't be entitled to

10  have contentions about why infringement is occurring but hold

11  them back until they feel it is safe for them to put them on

12  the table and we are done with the claim construction.

13          Interestingly, as part of their response they say

14  they need access to our information in order to provide those

15  contentions. A few points on that. It is worth noting that

16  they just -- they didn't plead this case on information and

17  belief, but instead they specifically pleaded that over 100

18  products "blatantly infringe" the asserted 120 patent claims.

19  In fact, they just filed an amended complaint less than two

20  weeks ago where they specified these products in the Complaint

21  and they say they blatantly infringe.

22          I have been practicing ten years in this space. Not

23  a long time, but a fair amount. I have never seen a complaint

24  where somebody uses the word "blatant" in front of

25  infringement. I have seen willful. I have seen various

1  allegations, but blatantly infringing is a pretty bold

2  statement.  If the infringement is blatant, why do I have to

3  go trancing around through these charts to footnotes, to

4  supras, and this and that and not be able to find out how a

5  single product infringes a single claim?

6           They are not saying in their Complaint that they

7  don't know.  They are saying the exact opposite.  They are

8  saying it is a blatant infringement.  Where is the blatant

9  infringement in their chart?  It is not there.  We believe

10  that request is consistent with the relief that Your Honor

11  ordered in the <u>American Video Graphics</u> case in which my

12  colleague Mr. Baxter was involved and ordered a

13  supplementation of the preliminary infringement contentions 30

14  days after the production of documents.

15           What we have asked for in this case is

16  supplementation.  We haven't asked for any money or sanctions.

17  We want them to tell us, and we would sure appreciate an order

18  from Your Honor that says you have got to do this, folks, you

19  have got to do this.  You have got to do it at a particular

20  time, and this is that time.  And that is what is going to

21  happen.  That is what we asked for.  And I think the relief we

22  have asked for is very consistent with what we requested in

23  <u>American Video Graphics</u>.  Frankly, I don't care what they look

24  at.  I am not trying to say you have to tell us now based only

25  on this bucket of information.  They are accusing me of trying

1    to set up a Rule 11 claim.

2            Whether there is a Rule 11 claim or not, I just want

3    to know why we have infringed so we can defend the case.    That

4    is far more important, so I am not trying to box them in on

5    what document they had at what time.    I just want to know.    I

6    don't frankly care what they look at; but if the belief is

7    that they are not really going to tell us, one, what they

8    already know, which is more than what they have told us; and,

9    number two, they are just going to wait and do it after we go

10   through discovery and we get done with the claim

11   constructions, that is just not fair.    It is not fair.    It is

12   not consistent with the way this Court would like to progress

13   the case under the patent rules to a prompt trial.    We really

14   do need this information before we provide claim

15   constructions.

16           THE COURT:    Okay.    Thank you.

17           Response, Mr. Perez?

18           MR. PEREZ:    Yes, sir.    Your Honor, when I was

19   challenged with the opportunity to present picks to you in

20   this Court, I did my due diligence.    I went to Glenn Thames,

21   Local Counsel, with Potter Minton and I asked him what do you

22   have to do when you present picks to Judge Davis and actually

23   the way you have done in front of Judge Ward?    And I got

24   various samples of what is done before you, Your Honor.

25           Likewise, I am on the defense side of three cases

1    pending in the Eastern District of Texas, and I have seen

2    several picks presented to me; and candidly I was a bit

3    frustrated because they were too vague for me.  I wanted these

4    to be thorough and detailed.  I went to extra efforts to make

5    sure we were thorough and detailed.  I want to walk you

6    through and illustrate what we did for Your Honor.  And,

7    likewise, Your Honor, I went through your case of March 17th,

8    2004 and then your recent case the March 11, 2005 and relied

9    upon those.

10        Your Honor, I have done everything I believe

11    necessary, and candidly I think we have gone beyond that.  I

12    am going to show that to you here in just a moment.

13        We did all of this without getting access to any

14    source code or confidential information from Cisco.  We went

15    on Cisco's website and we went to publicly-available

16    information to get our infringement contentions.  And,

17    likewise, we relied upon a consulting expert who had some core

18    work product that we got involved in and learned and patent

19    lawyers, EE's got involved and did the analyses.  We put

20    together in our infringement contentions a thorough analyses,

21    which incorporates a lot of the core work product.  I

22    understand that.  That is what he was alluding to.

23        What I do find a little troubling, Your Honor, is he

24    puts in front of the board the '404 Patent.  The '404 Patent

25    is a patent we didn't even discuss.  It was a patent he wasn't

1    willing to discuss.  We discussed the '307 Patent for one full

2    day.  He brought to our attention two elements he thought were

3    important to give more detail on.  That is a determining step

4    and some more information on the dependent claims.

5         What we did was we supplemented.  And after we

6    supplemented we invited him to meet and confer with us longer.

7    And instead of meeting and conferring with us for 21 days, he

8    teed up this motion, and we are here today, Your Honor.

9         Let me tell you a little bit about the technology

10   first in the invention and then I want to go to the claim

11   charts and walk through what we did for Your Honor and for

12   this Court.  What ConnecTel patents are, is it was the first

13   time there was the use of a unique combination to optimize the

14   transmission of data from point to point, from Dallas to -- if

15   you are in New York to New York.  What they did is they

16   analyzed, or the patent talks about is analyzes the property

17   of the data, what are the characteristics of the data.

18        It also incorporates factors of predetermined

19   parameters, such as, is it priority mail?  Is it important for

20   it to be secured?  Is it a large package?  Is time not of the

21   essence?  Likewise, on a real time bases -- and this is

22   important, Your Honor -- on a real time bases it determines

23   the condition of the path, the pipeline so to speak, and

24   optimize that pathway through algorithms.  And by their

25   nature, Your Honor, algorithms are embedded in the source

1    code. And certainly we did point to intelligent routing,

2    optimization, language in their product spec sheets that

3    alluded to that. And, candidly, Your Honor, I have offered

4    many times to supplement these picks after we get access to

5    the source code. The first time they were made available to

6    us? Yesterday. Let me get into the analysis, Your Honor.

7            THE COURT: Do you have all of the source code you

8    need now?

9            MR. PEREZ: You know what, Your Honor, we don't know

10    that. We have asked them to characterize the volume and to

11    characterize what they have given us. They haven't given us

12    that. Garreth Sarosi over here went over there yesterday and

13    tried to do an assessment of what the source code was and to

14    what extent we have all of the versions, and I can't tell you

15    in all candor that I know. We hope in the next week or so to

16    find that answer out. We will have our consultant go down

17    there. We have a few more hoops and loops we have to go

18    through under the protective order. And that is kind of

19    important to this -- and if I am talking too fast for the

20    Court Reporter -- I'm sorry. I will slow down.

21            There is some things that we have to go through in

22    order to get access to the source code. We have our expert

23    vitae that we are going to give over to counsel probably

24    tomorrow, let them look at it, and they are going to have

25    access to that source code to look at it and analyze it.

1    And, by the way, Your Honor, the reason why the

2    Court entered the protective order as late as May 9th is

3    because we didn't use this Court's standard protective order

4    because Cisco didn't want to. And you know what, we

5    negotiated a long time on that protective order. They wanted

6    a protective order --

7        THE COURT: Okay. Let's go on with --

8        MR. PEREZ: Yes, sir. Let me go ahead and get the

9    claim charts. I am going to walk around if you don't mind,

10   Your Honor.

11       THE COURT: Okay.

12       MR. PEREZ: I don't have electronics, which I should

13   have. But I do have a three-ring binder for you to look at,

14   and you can look at it along with counsel. Counsel has

15   samples of those exhibits. Your Honor, there may be more

16   exhibits than are necessary. But I am prepared to go ad

17   nauseum if necessary to show you what we have done.

18       Here are claim charts. This one is the '307 Patent

19   Claim No. 1. This is the only claim -- we actually had a

20   conversation with counsel, the only one. We tried to go over

21   what we did. Looking at the footnotes that are -- that they

22   say have no substance, let me give you an example of what we

23   have done. Here I will walk you through Footnote 3, which is

24   the determining step. I will walk you through property of the

25   data file step, and I will walk you through their parameter

1   step -- Your Honor, if you want to go through more we sure
2   can.

3           Here are the footnotes we are referring to.  These
4   footnotes, they don't gloss in point to a product spec sheet.
5   As you can see, Your Honor, for example, on the second -- the
6   Footnote No. 3, Tab No. 2, we refer to a specific Cisco
7   Internet router data sheet picks -- 1, 2, and 3.  You go to
8   Footnote No. 3.  We refer to the IOS -- the "Cisco IOS In A
9   Nutshell," Pages 101 to 127.  We have a copy of that if you
10  would like to look at it.  And also Tab 32, which is a routing
11  data sheet.  Page 1 and 2 and 4 and 7.  So if you look at the
12  first determining step, and that would be Pages 1 and 2, 4
13  and 7, you have to ask yourself does it support that
14  determining step.

15          Your Honor, the determining step is actually
16  described -- and I have highlighted just a portion of it.
17  "Cisco's OER helps enable the intelligent path selection of a
18  plan edge based upon performance sensitive routing metrics
19  such as time, loss, path availability, traffic load
20  distribution, and cost minimization."  It actually goes on to
21  what I talked about earlier.  It is this real time routing
22  adjustment based upon performance that makes Cisco's OER an
23  important building block for building highly available path
24  access across Internet.

25          And I also want to refer to another page just on

1    that one footnote. We refer to Page No. 2 which refers to

2    performance parameters, which are the variables I am talking

3    about that are being weighted. Let me -- I apologize for the

4    encumbrance of these things. Also refer to Page No. 4, which

5    talks about route optimization and performance

6    characteristics. This is just one element from one patent of

7    one product.

8         Furthermore, I would refer to Page No. 5. Again, it

9    talks about different measurements and things that you would

10   consider in your optimization step, Your Honor. That is the

11   determining step. That is just one product, that product

12   being the Cisco 10720 referring to one element of one patent.

13   We did that for each and every product. Here are the claim

14   charts -- and I apologize to this Court, and I did in my brief

15   that we actually listed this as an attachment when we filed

16   it. It was very cumbersome. But it is not just to illustrate

17   the voluminous nature. If you go in reverse order you have a

18   binder for routers, which are some 20-something, switches,

19   gateways, and the IOS software.

20         We went to the Cisco website and we pulled the

21   specification sheet and then we went claim by claim, element

22   by element for each and every one of those. Your Honor, I

23   think that goes above and beyond. Certainly put them on

24   notice. And the reason why it put them on notice is when they

25   gave us their invalidity contentions they gave me three boxes

1  of invalidity claim charts and a disk that was equivalent to

2  100 boxes of documents.  I think they know what we want.

3      If we want to go further, Your Honor, I can talk

4  about the property of the data file.  I can go through that.

5  I also have some other handouts for you about the routers and

6  the gateways.  I think you know what I am getting at.  I can

7  give you some illustrations, Your Honor, of the dependent

8  claims.  I think that is probably important, as well.  I can

9  go as long as you would like.

10      THE COURT:  I have seen what you have done.

11      MR. PEREZ:  Got it.  Let me go back, Your Honor,

12  over here.  I have given you in that handout --

13      And, Julie, would you mind giving them a copy so

14  they can have access to them.

15      A sampling of what we did for our independent

16  claims, what we did for our routers, and what we did for

17  gateways.

18      Yeah, there is common language.  And the reason

19  there is common language is you can only call a property of

20  the data so many things.  And we refer to the same footnote.

21  And they make fun of my supras.  Well, they ought to read the

22  supras because the supras relate to actual text in those

23  product spec sheets.

24      Similarly, Your Honor, the products themselves, the

25  families of the products.  They said there was 110 products.

1  I can show you examples of product spec sheets that are

2  almost -- revised. So a lot of their products on their

3  website, and there may be ten products, eight products that

4  have almost the same description. So, yeah, it is repetitive

5  in nature. I understand that. But I think it is thorough.

6         Again, Your Honor, we did all this without access to

7  confidential information. And when we get the confidential

8  information, when we get the source code, we will supplement.

9  We have said that in our briefs, and I have said that to them

10  on the phone.

11         I do have to rebut a couple of points they made,

12  Your Honor. And I said it once, they never discussed with us,

13  they never picked up the phone and asked us about the '404

14  Patent that they threw up on the board. If they had asked us,

15  I guess -- my question is what do you want to know? Ask me.

16  That is what I asked in the correspondence and asked them on

17  the telephone. When they asked me about the claim '307, I

18  gave them the determining step. When they talked about the

19  shortness of explanation to the dependent claims, I gave them

20  back-up for each and every dependent claim.

21         I don't think they should be mocking me giving them

22  the "Cisco IOS In A Nutshell." We found it helpful. I guess

23  it refers to Cisco's networking simplified. It has the same

24  kind of language. I wanted to make clear to them what I was

25  looking for. Again, I think that their production to me in

1   the invalidity claim charts made that real clear.

2          Your Honor, we will supplement. But in your two

3   opinions that are out there, I notice some very interesting

4   language. One -- in one particular case, it was your first

5   case, you made mention -- it was AVG case. You made note that

6   since counsel is at an impasse, I have got to rule. The only

7   impasse here was they are willing to drive in my direction

8   after I invited them to. I would love to open up this

9   dialogue. I would love this Court to make us open up this

10  dialogue. We will supplement to the extent necessary. We

11  want them to know what they are being accused of infringing

12  because we don't want this case to go offtrack.

13         We complied with this Court's mandate, both under

14  the ST Microelectronics and under the American Video Graphics.

15  We just got access to the source code. And we will beef up

16  our claim charts as required and as necessary.

17         THE COURT: All right. Mr. Perez, I think you are

18  reading ST too broadly and American Video Graphics too

19  narrowly.

20         MR. PEREZ: Tell me, sir. I will be pleased to

21  address your concerns.

22         THE COURT: Well, I want to ask you are you serious

23  about this lawsuit?

24         MR. PEREZ: Yes, sir.

25         THE COURT: As the Court expects plaintiffs when

1  they file a case to be able to identify their infringement

2  contentions, and I don't think that you have complied.  You

3  know, it concerns me that you are alleging 120 claims and 100

4  products.  And I hope this is not some kind of just shotgun,

5  throw everything up and see if we can find something that

6  sticks.  But I am sympathetic to Cisco's position, and we need

7  to talk about what kind of relief to give them to get this

8  thing back on track.  This thing is set for trial in August --

9  on August the 14th of 2006.

10      MR. PEREZ:  Yes, Your Honor.

11      THE COURT:  And for this Court to be able to move

12  cases as fast as you would like for this Court to move it

13  being the plaintiff in this case, we have got to have greater

14  compliance than what I think you have given here.  I don't

15  think repeating the claim language and I don't think string

16  citing back to their literature is enough.

17      Now, I want to know what does Cisco need to know

18  what this lawsuit is about?

19      MR. LAMISON:  Thank you, Your Honor.  We would like

20  to have supplemental contentions that do provide the

21  infringement.  We would like, ideally, to have those 30 days

22  before we have to provide claim constructions.  That would be

23  the -- that would be very helpful.  It would enable us to

24  focus the claim constructions and not have to overconstrue or

25  underconstrue.  And with respect to the discovery --

1      THE COURT:  Would exemplar examples be helpful to

2  you?

3      MR. LAMISON:  Absolutely.

4      THE COURT:  That is one thing I noted that you don't

5  give a single exemplar example of stepping it through as to

6  this particular type of product.

7      MR. PEREZ:  Your Honor, what I can certainly do for

8  Cisco and for this Court is to do precisely what I did in the

9  highlighted areas.  I have referred to pages as descriptions

10  of where those elements exist.  I have -- and Your Honor, it

11  was something that certainly we are more than willing to

12  share.  Obviously this is work product.  But we have our claim

13  charts; and we refer to, for our own edification, highlighted

14  areas where those very elements -- for example, on this one,

15  Your Honor, exist.  Here we are talking about property of the

16  data.  These are features of virtual private networks over IP.

17  I can refer to those highlighted areas with the understanding,

18  of course, it may be in other portions of the text.  I can

19  refer to specific highlights within the data sheets that I

20  have identified.

21      THE COURT:  Are you going to expect this Court to

22  construe 120 claims?

23      MR. PEREZ:  Your Honor, I don't believe that is

24  going to happen, no, sir.

25      THE COURT:  When are we going to get it narrowed

1   down?

2          MR. PEREZ:  I will have it narrowed down within

3   probably 60 days once I have seen their source code analyzed

4   and I can back off on some of those claims.  I would suspect

5   this thing would be trimmed down to less than 50.

6          THE COURT:  Okay.  What else do you need?

7          MR. LAMISON:  We would like an order similar to the

8   one in American Video Graphics that orders them to supplement

9   within "X" number of days of the documents being provided.  I

10  think that is the best way to insure we get the information.

11         THE COURT:  When are you going to provide the

12  documents?

13         MR. LAMISON:  We have started to do that and -- as

14  fast as possible.  The protective order unfortunately took a

15  long time.  It was proposed even before the docket control

16  order was in place.  There were disagreements over whether we

17  were -- what third parties or special protections for source

18  code.  It took an inexplicably long amount of time to come to

19  an agreement on that, and we were pushing very vigorously to

20  get the protective order in place, so -- that is not because

21  we weren't willing to talk to them.  We were very vigorously

22  trying to get that in place.

23         So we have certainly got source code that is in Mr.

24  Baxter's office right now that Mr. Sarosi came over to see

25  yesterday.  If they want to see every single version of source

1   code, that is quite a bit --

2           THE COURT:  Is that what you want to see or

3   exemplar --

4           MR. PEREZ:  Your Honor, I will probably need to see

5   more for the past devices.  There are certain devices I have

6   alleged that are present devices as of the first quarter of

7   2005.  Some of those devices may fall out once I look at the

8   algorithms of the current source code, but there are some past

9   devices that may be infringing -- those are documents that

10  were requested.  I assume we are going to get those, so I may

11  need to see some older versions of the source code to verify

12  certain algorithms.

13          THE COURT:  What else do you need?

14          MR. LAMISON:  That's what we need.

15          THE COURT:  What do you need?

16          MR. PEREZ:  I do need to get expedited them

17  approving of the experts looking at it.  I have got to have

18  access to McKool's office in Dallas and get our people in

19  there to look at the source code and unravel it.  Your Honor,

20  I think 30 days is a little bit tight given we just got access

21  to the source code.  I would propose 60.

22          THE COURT:  What is this going to do to your

23  schedule?

24          MR. LAMISON:  Well, that is the issue.  In fairness

25  what we want is to have these contentions before we have to do

1   the constructions. I think for 120 claims and 100 products,
2   30 days to look at that would be appropriate. I think 60 days
3   to do this from, for example, today, then that would be 90
4   days which would put us out to -- that would put us into
5   mid-August rather than June 16th, which is the current date.
6   August 16 would have been the discovery deadline for claim
7   construction.

8            THE COURT:  Do you have any problem with that?
9            MR. PEREZ:  Which one, Your Honor?
10           THE COURT:  Pushing it out to August.
11           MR. PEREZ:  I don't have any problems providing our
12   Markman Hearing doesn't move and our trial date doesn't move.
13           MR. LAMISON:  I don't think we need to move the
14   trial date. I think we could probably try to work together
15   about the Markman date and some of those later dates to
16   preserve the trial date.
17           MR. PEREZ:  We have talked about actually and I have
18   agreed to moving it -- any of the two weeks after
19   Thanksgiving. It is now set for November 17th. They wanted
20   to kick that because they have a conflict of trial. We are
21   willing to do that, obviously, at the Court's convenience.
22           MR. BAXTER:  Your Honor, I communicated to the Court
23   staff about the Markman Hearing. In all candor, when I talked
24   to the staff they looked at your calendar and you have got
25   some trials and some other dates that may conflict. I didn't

1  want to wade off in the swamp without revealing that. The

2  Court staff has looked at your calendar. And we had asked not

3  because of these problems but because of the trial conflict

4  one of the lawyers in this case has. I don't want the Court

5  to move the day without knowing that your staff at least

6  understands that you have got some date problems.

7          THE COURT: Okay. All right. The Court will -- is

8  going to enter an order. We will have it out to you by the

9  end of this week outlining for you what you need to do and

10  adjusting the dates as the Court deems appropriate.

11          Anything further from the parties?

12          MR. BAXTER: No, Your Honor.

13          THE COURT: All right. I would just admonish both

14  parties, and I don't know which side the communication is -- I

15  hear both of you saying we are wanting to talk and the other

16  one is not talking. Let's talk. Let's get these things

17  resolved. Let's be candid with each other. Let's don't be

18  hiding the ball. Let's get it out on the table, find out what

19  this case is about so y'all can evaluate it. And if you can't

20  get it settled, we will get it narrowed down to something

21  triable and we will try it. Okay?

22          MR. PEREZ: Thank you, Your Honor.

23          THE COURT: We will be adjourned.

24          MR. BAXTER: Thank you, Your Honor.

25          (End of hearing.)

1                        C E R T I F I C A T I O N

2

3      I certify that the foregoing is a correct transcript from the

4      record of proceedings in the above-entitled matter.

5

6

7                                              7/05/05

8      SHEA SLOAN, CSR, RPR
       OFFICIAL COURT REPORTER
9      STATE OF TEXAS NO. 3081

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25